UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFERY L. WELLS, #688492,

   Petitioner,

            Case No. 13-CV-12734

v.

            HON. MARK A. GOLDSMITH

SHERRY L. BURT,

   Respondent.

_____/

**OPINION AND ORDER
(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS (Dkt. 1), (2) DENYING
PETITIONER'S MOTION FOR RECONSIDERATION (Dkt. 14), (3) DECLINING TO
ISSUE A CERTIFICATE OF APPEALABILITY, AND (4) GRANTING LEAVE TO
APPEAL IN FORMA PAUPERIS**

## I. INTRODUCTION

Petitioner Jeffery Wells, currently confined at the Muskegon Correctional Facility in
Muskegon, Michigan, filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254 (Dkt. 1), challenging his Wayne County convictions for conspiracy to commit first-degree
murder, Mich. Comp. Laws §§ 750.157a, 750.316; assault with intent to commit murder, Mich.
Comp. Laws § 750.83; and possession of a firearm during the commission of a felony, Mich.
Comp. Laws § 750.227b.  Petitioner is serving a sentence of life imprisonment for the conspiracy
conviction, 30-to-50 years in prison for the assault conviction, and a consecutive term of two
years in prison for the felony firearm conviction.  Respondent Sherry Burt urges the Court to
deny the petition on grounds that Petitioner procedurally defaulted some of his claims, and that
the state-court decisions were not contrary to federal law, unreasonable applications of federal
law, or unreasonable determinations of the facts.  Resp't Answer at 75 (Dkt. 8).  Petitioner has

1

also filed a motion for reconsideration (Dkt. 14), in which he seeks the Court to reconsider its order denying Petitioner an evidentiary hearing.

For the reasons stated below, the Court denies the petition for writ of habeas corpus, denies Petitioner's motion for reconsideration, declines to issue a certificate of appealability, and grants leave to appeal in forma pauperis.

## II.  BACKGROUND

### A.  The Trial

Petitioner was charged in Wayne County, Michigan with conspiracy to commit first-degree murder, four counts of assault with intent to commit murder, one count of felon in possession of a firearm, two counts of felonious assault, and one count of felony firearm.  The charges arose from allegations that Petitioner conspired with Mario Crouthers to murder a drug dealer named Roderick Simmons, and that he aided and abetted Crouthers in shooting at Simmons, Simmons's wife Charlotte, and two state troopers who intervened in the incident with Mr. and Mrs. Simmons.  The incident occurred at an intersection in Detroit on November 21, 2007.  Petitioner, Mr. Simmons, and Crouthers were shot during the incident.  Crouthers died from his gunshot wounds shortly after the incident.

The prosecutor's theory at trial was that Petitioner intended to kill Mr. Simmons to avoid having to pay Simmons $80,000 for a drug debt and possibly to avoid having Simmons, who was cooperating with federal authorities, implicate him in drug crimes.  The defense theory was that Petitioner arranged to meet Simmons at the intersection to pay his drug debt or to explain why he did not have the money.  He maintained that the meeting went awry when Crouthers approached the Simmons's vehicle and got into an argument with Mr. Simmons.  Petitioner was tried before a jury in Wayne County Circuit Court where the following witnesses testified.

2

a.  Trooper Keyonn Whitfield

Michigan state trooper Keyonn Whitfield testified that, on November 21, 2007, he and trooper Mark Lambert stopped at a gas station on the corner of Dexter and West Grand Boulevard in Detroit so that he could finish some paper work for a recent car crash.  About five to 10 minutes later, he noticed someone walking in the street.  Then he heard gunshots and saw the person firing a gun into the passenger side of a Buick Enclave, which was stopped at a traffic light.  Whitfield exited his vehicle, yelled "State Police," and proceeded to take cover.  The suspect by the Buick raised a gun and fired at Whitfield, who returned fire.  At that point, Whitfield saw a second person outside the vehicle.  Both suspects had handguns and proceeded to walk to the rear of a Lincoln Continental, which was parked behind the Buick.  Whitfield observed muzzle flash coming from that area and returned gunfire.  His attention was then drawn to a woman who was standing outside the Buick Enclave.  He ran over to her, knocked her down, and covered her so that she would not get hit by a bullet.  The second suspect subsequently pointed a gun at Lambert and then at Whitfield.  Whitfield fired two or three shots at the second suspect, who subsequently fell to the ground.  4/21/08 Trial Tr. at 150-159 (Dkt. 9-3).

Whitfield identified Petitioner at trial as the second suspect, the one who retreated between the two cars on the driver's side of the victims' car.  Whitfield was certain that Petitioner had pointed a gun at him and Lambert.  Although he did not actually see Petitioner fire a gun, he thought that both suspects may have fired their guns because they were in close proximity to each other and because gunshots came from their direction.  Id. at 160-161, 166-167, 180-182, 195-196.

b.  Trooper Mark Lambert

3

State trooper Mark Lambert testified that he was Whitfield's partner on November 21, 2007. He also recalled seeing a person approach the passenger side of a Buick Enclave that was stopped at a red light at the intersection of Dexter and West Grand Boulevard. He heard gunshots and saw the person firing at the Buick from the passenger side of the vehicle. He later learned that Roderick and Charlotte Simmons were the occupants of the Buick. Id. at 200-202.

Continuing, Lambert stated that both he and his partner exited their patrol car. He pulled out his weapon and told the man firing at the Buick to drop his weapon. The man turned toward the troopers and fired his gun; Lambert returned fire. The man then retreated to the rear of a silver Lincoln Continental. Lambert saw a second individual point a weapon at the troopers from the other side of the Lincoln. Lambert then retrieved a rifle from the trunk of the patrol car and, after observing more muzzle flash come from the rear of the Lincoln Continental, fired it. Id. at 202-204.

Lambert stated that the man on the passenger side of the Buick Enclave was Mario Crouthers, who died later that day. Lambert was unable to identify the second man, and he admitted at trial that he did not see Petitioner by the Buick Enclave that night. Lambert also was unable to say whether the second man fired his weapon at the officers, but he did see the man point a gun at him. And, after a back-up crew arrived, he saw Petitioner lying on the ground with a handgun about twelve inches from his body. Id. at 206-210.

### c.  Troopers Richard Fell, Aaron Weinrick, and Christopher Kurish

State trooper Richard Fell testified that he and trooper Aaron Weinrick responded to the crime scene after being notified that shots were fired. He saw a state police car parked at the gas station on the corner of West Grand Boulevard and Dexter, and he saw two other vehicles parked one behind the other on Dexter. The vehicle in front was the Buick Enclave; the second car was

a Lincoln Continental.  He noticed Lambert holding a rifle by the patrol car.  Whitfield was lying on top of Mrs. Simmons in front of the Buick Enclave.  Fell ensured that nobody was in the Lincoln and then turned his attention to the two people lying on the ground near the Lincoln. The person lying at the rear of the vehicle was Crouthers; Petitioner had been shot and was lying on the driver's side of the vehicle about a foot away from a handgun.  Id. at 229-233, 237.

Fell went on to say that he picked up the weapon near Petitioner and turned it over to a Detroit police officer.  A second handgun was found on the rear driveway of the gas station, north of the Lincoln.  The slide was locked back, indicating that there was no more ammunition in it.  Id. at 233-234.

State trooper Aaron Weinrick corroborated Fell's testimony and identified Petitioner at trial as the person who was lying on the side of the Lincoln within twelve inches of a gun. 4/22/08 Trial Tr. at 7-8, 11 (Dkt. 9-4).  Trooper Christopher Kurish testified that he and Craig Tuer were part of a second back-up unit that responded to the scene.  He recovered the handgun lying in the driveway of the gas station, about 10 feet away from what he described as an Oldsmobile.  Id. at 15-18.

d.  Roderick Simmons

The complainant, Roderick Simmons, testified that he was shot shortly after 11:00 p.m. on November 21, 2007.  He explained that he and his wife had gone to a show at the Fox Theater that night.  After the show, a girl appeared to follow them to their car, but she turned and walked back when they reached their car and then used her phone.  Id. at 22-25.

Simmons stated that he and his wife had initially planned to go to a bar after the show, but then changed their plans and decided to go to a different bar after Mrs. Simmons talked to a friend on the phone.  Mrs. Simmons was driving that evening, and, on their way to the bar, she

5

missed a turn and had to circle back.  They stopped at a traffic light at the intersection of Dexter and West Grand Boulevard where Mr. Simmons heard some gunshots and got hit in the arm.  He saw a black jacket outside the vehicle and then noticed more gunshots enter the vehicle.  He was shot six times.  The person at his window subsequently pointed his gun in the direction of the gas station.  Id. at 22-28.

Simmons also testified that he knew Petitioner and had occasionally dealt drugs with Petitioner.  He claimed that Petitioner owed him a little less than $80,000.  Id. at 29-30.

Simmons admitted that, prior to the incident on November 21, 2007, the federal government arrested him for dealing in drugs, and that he was planning to report to a federal prison on January 5, 2008.  He denied receiving a deal from the government for his testimony at Petitioner's trial, and he claimed that his federal case was unrelated to Petitioner's case.  Id. at 30-31, 51.

On cross-examination, Simmons testified that he and Petitioner had a business enterprise in which he supplied the drugs.  He admitted being upset because Petitioner owed him almost $80,000 for three and a half kilos of cocaine.  He said, however, that Petitioner was not dodging him, that they had not talked about the money, and that there was no deadline for Petitioner to repay him.  Id. at 31-38.

Simmons denied receiving a call from Petitioner on the night in question, and he denied telling Petitioner to meet him at the gas station.  He did not know how Petitioner happened to see him there, but he assumed that Petitioner saw him at the Fox Theater.  At the time of the shooting, he was trying to get to another location.  He claimed that he did not need money and, although initially he and Petitioner had each other's numbers, Petitioner did not know his current

phone number because Simmons had a different phone from the one he had when Petitioner knew his number. Id. at 38-39, 54-56.

Simmons testified that he did not know Crouthers, had never seen him, did not have any problems with him, and did not know why either Crouthers or Petitioner would want to shoot him. He thought at the time that he had been caught in cross-fire. Simmons also denied getting into an argument with Crouthers on the passenger side of his vehicle, and he claimed that neither he, nor his wife, had a gun with them that night. Id. at 44-46, 63.

e. Charlotte Simmons

Mrs. Simmons corroborated much of her husband's testimony. She explained to the jury that, while she and her husband were stopped at a light near Grand River and Dexter on November 21, 2007, she heard gunfire and glass breaking. She got out of the car and proceeded to the front of the vehicle where she yelled to the police officers to stop shooting because her husband had been hit. One officer approached her and pushed her to the ground. She looked back, saw a car door open, and a foot emerge from the vehicle. The officer then asked her whether she saw any weapons. After she responded that she thought she saw a weapon, the officer fired his gun. A gun and body then dropped to the ground. Id. at 70-71, 85.

Mrs. Simmons stated that she did not see the injured man's face and that she did not know Petitioner at the time. She was able to identify Petitioner at trial because Petitioner and her husband were taken to the same emergency room after the shooting. She had no doubt at trial that Petitioner was the man who dropped a gun after being shot. She admitted, though, that she did not see Petitioner point a gun or fire a weapon at the officers. Nor did she see him on the driver's side of her vehicle.   In response to a question about whether her husband had asked

7

Petitioner to meet him, Mrs. Simmons stated that her husband was not on the phone.  Id. at 71-72, 78, 80, 85, 92-93.

> f.   Detroit Police Officers

Several Detroit police officers testified about their observations at the crime scene. Officer William Niarhos testified that there were approximately 68 casings at the scene.  Id. at 138.

Officer Thomas Smith testified that the vehicles at the crime scene were impounded and that bullet holes on the passenger side of the victims' vehicle were consistent with someone firing at the front of the vehicle or the passenger.  A cell phone was recovered from the victims' vehicle, and a bag with two new ski masks was found in the suspects' car.  On cross-examination by defense counsel, Smith testified that the cell phone was placed in a police property room, but that he did not look through the phone or know where it was.  Id. at 140-143, 147, 150-152.

In the jury's absence, defense counsel stated that he wanted to have the cell phone produced.  He argued that the cell phone was critical evidence because Petitioner was claiming that the alleged victim had used the phone to contact him.  Defense counsel indicated that the property room was across the street and that the phone should be available that day or the next day if it existed.  The trial court suggested that the parties find the cell phone.  Id. at 155-57.

> g.   Jeffery Wells

Petitioner was one of three defense witnesses.   He testified that he met Simmons in prison, exchanged numbers with him, and re-connected with him when he got out of prison. Petitioner stated that Simmons had loaned him $80,000 of "product," but that he did not owe Simmons $80,000.  He claimed to have repaid about $30,000 of the debt.  4/23/08 Trial Tr. at 22-26 (Dkt. 9-5).

8

Petitioner stated that his cell phone would show he talked to Simmons "all the time," but the police had taken all his belongings, including his phone, at the hospital and put the things in a bag. Petitioner claimed that he lost touch with Simmons when Simmons changed his phone number, but that Simmons had called him with his new number and had asked him when he would have the money. And he heard on the street that Simmons wanted his money. Id. at 29-34.

According to Petitioner, Simmons called him on the phone on the day in question and said that he wanted to meet him at the gas station on Grand Boulevard and Dexter. Petitioner arrived four minutes late and pulled up behind Simmons. Crouthers then got out of the car and talked to Simmons. Crouthers appeared to argue with Simmons and then fire a gun into the Simmons's vehicle. Petitioner got shot by the police while he was sitting in his car. He got out of the car and laid on the ground where he was shot again. He fell unconscious and woke up in the hospital. Simmons was next to him at the hospital, and he learned that Crouthers had passed away. He speculated that Crouthers may have wanted to shoot Simmons because Crouthers also owed Simmons some money. Id. at 37, 46.

Petitioner explained that the car he had been driving and the masks in the car belonged to his girlfriend Keisha Pope. He claimed that Keisha owned a motorcycle and that everybody who rides Harleys and Choppers uses masks to keep bugs out of their faces. Petitioner denied keeping the masks for a "hit." He also denied having a gun on the day in question, and he stated that he had no motive for wanting to hurt Simmons. Id. at 48-51, 53, 72.

On cross-examination, the prosecutor asked Petitioner about recordings of his telephone conversations with Keisha Pope while he was in jail. After one recording was played for the jury, the prosecutor asked Petitioner whether he had "slipped up" by trying to get his girlfriend to

lie for him and by asking her to say that the masks in the car belonged to her.  Petitioner responded that he knew the masks were in the car and that he had not asked Pope to "take this off of [him] because it look[ed] bad."  Id. at 98-100.

In the jury's absence, defense counsel informed the trial court that Petitioner had perjured himself by stating that no one had threatened him or his family and that he had paid Simmons $30,000 of the debt he owed him.  Petitioner subsequently testified on redirect examination that he had testified untruthfully when he stated that he was not afraid of Simmons and when he said that he had paid Simmons $30,000.  Petitioner claimed that he really owed Simmons $80,000 and that he had lied earlier in his testimony out of fear for his family.  He maintained, however, that the ski masks belonged to Pope and that he had to remind her of that fact because she was scared and did not want any part in his case.  Id. at 83-86, 107-110.

### h.  Sergeant Ron Gibson

Sergeant Ron Gibson of the Detroit Police Department testified for the defense that he was given the task of collecting video camera data for the case.  He claimed that one of the videos taken at the crime scene showed a vehicle stopping behind another vehicle.  The video also showed someone getting out of the passenger side of the car and moving forward to the passenger side of the victims' vehicle.  There was no visible movement on the driver's side of the car.  4/24/08 Trial Tr. at 4-5, 16-21 (Dkt. 9-6).

### i.  Sergeant Glynn Davis

Sergeant Glynn Davis was the officer in charge of the case.  He testified that a cell phone was taken from Simmons's vehicle, but that he did not check the call log on the phone and the battery was dead.  Id. at 28-30.  On cross-examination, the prosecutor brought out the fact that

the phone had been in evidence "since day one" and that, if somebody had asked to look at it, they could have done so.  Id. at 31-32.

On the first full day of deliberations, which was a Friday, the jury asked the trial court what they should do if the jury was hung on one or all counts.  The trial court encouraged the jurors to resume their deliberations in the hope of reaching a verdict.  4/25/08 Trial Tr. at 10 (Dkt. 9-7).  The jurors subsequently informed the trial court that they were "still hung" on all but one of the counts.  The trial court sent the jurors home for the weekend and ordered them to return on Monday morning to continue deliberating.  Id. at 16-26.

On the following Monday, the jury found Petitioner guilty of conspiracy to commit first-degree murder, Mich. Comp. Laws § 750.157a, Mich. Comp. Laws § 750.316; one count of assault with intent to commit murder, Mich. Comp. Laws § 750.83; and felony firearm, Mich. Comp. Laws § 750.227b.  4/28/08 Trial Tr. 5-6 (Dkt. 9-8).  The jury acquitted Petitioner of the other six counts.

### B.  The Sentence, Direct Appeal, and Collateral Proceedings

On May 13, 2008, the trial court sentenced Petitioner to two years in prison for the felony firearm conviction, followed by concurrent terms of life imprisonment with the possibility of parole for the conspiracy conviction and 30 to 50 years in prison for the assault conviction. 5/13/08 Sentencing Tr. at 19-20 (Dkt. 9-9).

Petitioner appealed his convictions, arguing that:  (i) there was insufficient evidence presented at trial to convict him of conspiracy to commit murder; (ii) the trial court abused its discretion when it refused to sequester Mr. and Mrs. Simmons; (iii) trial counsel was ineffective for calling Petitioner to testify that ski masks found in his car belonged to Pope, because this evidence opened the door to evidence that he had tried to procure her perjured testimony; and

(iv) the cumulative effect of several minor errors created an atmosphere of unfairness. The Michigan Court of Appeals rejected these claims and affirmed Petitioner's convictions and sentence in an unpublished, per curiam decision. See People v. Wells, No. 286213, 2009 WL 4653049 (Mich. Ct. App. Dec. 8, 2009) (Dkt. 9-16).

Petitioner raised the same issues in an application for leave to appeal in the Michigan Supreme Court. On April 27, 2010, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. See People v. Wells, 780 N.W.2d 799 (Mich. 2010).

Petitioner subsequently filed a motion for relief from judgment in which he argued that: (i) trial counsel was ineffective for failing to investigate and present a substantial defense; (ii) trial counsel was ineffective for failing to object or move for a mistrial when the prosecution used unpreserved evidence to deprive him of his only defense; (iii) the prosecution deprived him of the right to present a defense by withholding impeachment and exculpatory evidence; and (iv) the prosecution failed to preserve material evidence that would have corroborated the defense theory. Petitioner also argued that appellate counsel was ineffective for failing to raise these issues. See Pet'r Mot. for Relief from J. (Dkt. 9-14).

The state trial court denied Petitioner's motion pursuant to Michigan Court Rule 6.508(D)(3), which prohibits a state court from granting relief from judgment unless the movant alleges "good cause" for failing to raise the claims on direct appeal and "actual prejudice from the alleged irregularities that support the claim for relief." The trial court determined that Petitioner had not established "good cause" or "actual prejudice." See 12/30/11 Op., Case No. 07-024705-01, at 5 (Wayne Cnty. 3d Cir. Ct. Dec. 30, 2011) (Dkt. 9-13).

Petitioner appealed the trial court's decision to the Michigan Court of Appeals, which denied leave to appeal for failure to establish entitlement to relief under Rule 6.508(D). See

12

People v. Wells, No. 310001 (Mich. Ct. App. Oct. 24, 2012) (Dkt. 9-18).  On May 28, 2013, the

Michigan Supreme Court denied leave to appeal for the same reason.  See People v. Wells, 830

N.W.2d 400 (Mich. 2013).

### C.  The Habeas Petitioner, Answer in Opposition, and Motions

On June 20, 2013, Petitioner filed his habeas corpus petition in this Court, raising the

following nine claims:

 i. "Petitioner was denied the right to a fair trial and due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution when the prosecution failed to present sufficient evidence of a conspiracy to commit murder between himself and deceased co-conspirator, Carruthers [sic]."

 ii. "Petitioner was denied the right to a fair trial and due process of law pursuant to the Fifth and Fourteenth Amendments to the United States Constitution when the trial court failed to sequester Simmons[] who were scheduled and did testify 'because the case law and the statute are clear that they are allowed to be there.'"

 iii. "Petitioner was denied the right to a fair trial and due process of law pursuant to the Sixth Amendment to the United States Constitution when his trial counsel opened the door to otherwise inadmissible evidence by calling Petitioner to testify that ski masks found in his car belonged to Keisha Pope, and that opened the door to taped jailhouse phone calls Mr. Wells made to her that tried to procure her perjured testimony which cannot be put off as adequate and sound trial strategy."

 iv. "Petitioner is entitled to writ of habeas corpus due to the cumulative effect of several errors which warrant reversal even if the individual errors in the case would not where there is an established air of unfairness mandating reversal in violation of Petitioner's right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution."

 v. "Petitioner was denied the effective assistance of trial counsel in violation of his Sixth Amendment right to the United States Constitution when counsel failed to investigate and present the evidence of the cell phone left in his car and the cell phone records which directly supported his substantial defense at trial."

13

vi.  "Petitioner was denied the effective assistance of trial counsel in violation of his Sixth Amendment right to the United States Constitution when counsel failed to object, seek a continuance, or file a motion for mistrial when the prosecution used unpreserved evidence to deprive Petitioner of his only defense."

vii.  "Petitioner was denied the right to a fair trial guaranteed to him by the Fifth and Fourteenth Amendment[s] when the prosecution withheld exculpatory evidence and impeachment evidence which denied Petitioner the right to access to the evidence of his cell phone which was in his car at the time of the incident l[e]ading to his charges – thereby denying him the right to present a defense."

viii.  "Petitioner was denied the right to a fair trial when the trial court clearly erred/abused its discretion when it failed to order a mistrial when the prosecution failed to preserve material evidence that was favorable to the Petitioner."

ix.  "Petitioner was denied the effective assistance of appellate counsel in violation of his Sixth Amendment right to the United States Constitution when appellate counsel failed to raise the above issues on appeal."

Pet. at 3-4 (Dkt. 1).

Respondent argued in an answer to the petition that Petitioner had not exhausted state remedies for his second claim and that the second claim, as well as the fifth, sixth, seventh, and eighth claims were procedurally defaulted.  See Resp't Answer at 4-5 (Dkt. 8).  Petitioner then moved for an evidentiary hearing and to amend his habeas petition to delete three of his habeas claims.  See Pet'r Mot. for Evidentiary Hr'g (Dkt. 10); Pet'r Mot. to Amend (Dkt. 12).  The Court denied Petitioner's motion for an evidentiary hearing, but granted his motion to amend the habeas petition.  See 6/11/14 Op. & Order (Dkt. 13).  The amended list of claims now includes: claim one (insufficient evidence); claim three (ineffective assistance of trial counsel — opening the door to inadmissible evidence); claim five (ineffective assistance of trial counsel — failure to investigate and present evidence of the cell phones); claim six (ineffective assistance of trial

14

counsel — failure to object to the prosecutor's use of unpreserved evidence); claim seven (prosecutorial misconduct — withholding evidence); and claim nine (ineffective assistance of appellate counsel).

Also pending before the Court is Petitioner's motion for reconsideration of the Court's order denying his motion for an evidentiary hearing. (Dkt. 14).

### III.  STANDARD OF REVIEW

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  Williams v. Taylor, 529 U.S. 362, 405-406 (2000).  An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."  Id. at 409.  A federal habeas court may not "issue the

writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

The Supreme Court has explained that a "federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Thus, the AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (quotation marks and citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) (quotation marks). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citation omitted). Furthermore, pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id. Habeas relief is not appropriate unless each ground that supported the state-court's decision is examined and found to be unreasonable under the AEDPA. See Wetzel v. Lambert, 132 S. Ct. 1195, 1199 (2012).

"If this standard is difficult to meet, that is because it was meant to be." Harrington, 131 S. Ct. at 786. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from re-litigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the

16

Supreme Court's precedents.  Id.  Indeed, section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  Id. (quotation marks omitted).  Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law."  Woodford v. Viscotti, 537 U.S. 19, 24 (2002).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state-court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington, 131 S. Ct. at 786-787.

A state court's factual determinations are presumed correct on federal habeas review.  See 28 U.S.C. § 2254(e)(1).  A habeas petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-361 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court."  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).

## IV.  ANALYSIS

### A.  Habeas Petition

#### 1.  Claim One: Sufficiency of the Evidence

Petitioner alleges that there was insufficient evidence produced at trial to support his conviction for conspiracy to commit first-degree (premeditated) murder.  The Michigan Court of Appeals adjudicated this claim on the merits and concluded that the prosecution provided sufficient circumstantial evidence to support Petitioner's conviction.

#### i.  Clearly Established Federal Law

17

"A defendant challenging the sufficiency of the evidence bears a very heavy burden."

United States v. Prince, 214 F.3d 740, 746 (6th Cir. 2000) (quotation marks). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318-319 (1979) (quotation marks, citations, and footnote omitted) (emphasis in original). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." United States v. Vannerson, 786 F.2d 221, 225 (6th Cir. 1986).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." McGuire v. Ohio, 619 F.3d 623, 631 (6th Cir. 2010). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (quotation marks omitted) (emphasis in original). Second, even if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." Id. (emphasis in original).

### ii.  Application

18

The <u>Jackson</u> standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  <u>Jackson</u>, 443 U.S. at 324 n.16.  The Michigan Court of Appeals explained the elements of conspiracy to commit first-degree murder as follows:

> A conspiracy is an agreement, express or implied, between two or more persons to commit an unlawful or criminal act.  To sustain a conviction for conspiracy to commit first-degree murder, the prosecution must prove beyond a reasonable doubt that the conspirators deliberated and planned the crime with the intent to kill the victim.  Premeditation and deliberation may be inferred from all of the facts and circumstances surrounding the crime.  Because a conspiracy is complete upon formation of the agreement, no overt act in furtherance of the conspiracy is necessary to support the conviction.

<u>Wells</u>, 2009 WL 4653049, at *1 (quotation marks and internal citations omitted).  The Court of Appeals summarized the facts supporting Petitioner's conspiracy conviction as follows:

> Defendant and the shooting victim had sold drugs together, and there was evidence that defendant owed the victim a significant amount of money for a past delivery. Defendant was driving the vehicle that pulled up behind the shooting victim and his wife. The victim denied having made arrangements to meet defendant and his coconspirator at the scene.  Indeed, the victim testified that he did not know the coconspirator, yet it was this man who exited the vehicle defendant was driving and began shooting.  There was evidence that defendant was also armed and that he had turned his gun on a Detroit Police officer before the officer shot him.

<u>Id.</u>

There was additional evidence that a woman followed Mr. and Mrs. Simmons from the Fox Theater to their car and then made a phone call.  There was still other evidence that two new masks were discovered in the car Petitioner was driving on the night of the crime.

The jury could have inferred from all the evidence taken in the light most favorable to the prosecution that:  (i) Petitioner conspired with Crouthers to murder Simmons to avoid having to pay Simmons $80,000 for a drug debt; (ii) Petitioner and Crouthers followed Simmons to Grand

19

Boulevard and Dexter after a woman informed them by phone of Simmons's location; (iii) Crouthers approached Simmons on the passenger side of the car because Simmons did not know him; and (iv) Petitioner aided and abetted Crouthers in the shootings and assaults by being armed. There was no evidence that the crime was a random act. And although Petitioner and Simmons gave conflicting testimony on whether the meeting was pre-arranged,

> [a] reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims.

Matthews v. Abramajtys, 319 F.3d 780, 788 (6th Cir. 2003) (citations omitted).

A rational trier of fact could have concluded from the evidence that the prosecutor proved the elements of conspiracy to commit first-degree murder, that is, an agreement to do a criminal act and a deliberate plan to kill Simmons. Even if the Court had concluded otherwise, the Michigan Court of Appeals reasonably opined that "inferences stemming from the circumstances of the street encounter, the shooting itself, and the subsequent confrontation with the police provide sufficient support for defendant's conviction." Wells, 2009 WL 4653049, at *1. This Court must defer to the state court's sufficiency determination because that determination was not unreasonable. Brown, 567 F.3d at 205. Therefore, the Court finds that Petitioner is not entitled to habeas relief on his first claim.

### 2. Claim Three: Trial Counsel

Petitioner claims that his trial attorney deprived him of effective assistance of counsel by putting him on the witness stand and asking him about the masks in the car that he was driving on the night of the shooting. Petitioner claims that this question opened the door to evidence that

he tried to procure his girlfriend's perjured testimony.

### i. Supreme Court Precedent

To prevail on his claim, Petitioner must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687 (1984). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

The "deficient performance" prong of the Strickland test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689.

To demonstrate that counsel's performance prejudiced the defense, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "This does not require a showing that counsel's actions more likely than not altered the outcome," but "[t]he likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111-12 (quotation marks omitted).

### ii. Asking Petitioner About the Ski Masks

Petitioner alleges that his attorney's question about ski masks opened the door to inadmissible evidence about his telephone calls to Pope from the county jail. In one of the calls, Petitioner repeatedly asked Pope to say that the masks were hers. Petitioner contends that his

attorney knew or should have known the contents of the recordings of his telephone calls and that the prosecution would use the recordings as rebuttal evidence.

The Michigan Court of Appeals adjudicated this claim on direct appeal and found no merit in it. The court stated that there was no evidence in the record that defense counsel either encouraged or discouraged Petitioner to take the stand. Wells, 2009 WL 4653049, at *2. As for defense counsel's question about the ski masks, the Michigan Court of Appeals refused to second-guess defense counsel's attempt to separate Petitioner from that evidence and from the prosecutor's inference that Petitioner premeditated the crime. Id. at *3.

This Court finds no merit in Petitioner's claim for similar reasons. To the extent he is blaming his attorney for calling him as witness, Petitioner's claim lacks merit, because there is nothing in the record to suggest that Petitioner did not want to testify.

As for the masks, it was the prosecutor who initially elicited testimony about the two new ski masks in the car, which Petitioner was driving on the night in question. 4/22/08 Trial Tr. at 146-48 (Dkt. 9-4). Defense counsel subsequently placed Petitioner on the witness stand and asked him about the masks. 4/23/08 Trial Tr. at 48-52 (Dkt. 9-5). The obvious reason for the question was to distance Petitioner from the masks, that is, to show that the masks did not belong to Petitioner, that they were not meant to be used during the commission of a crime, and that Petitioner and Crouthers did not premeditate the crime. Defense counsel's inquiry about the ski masks was reasonable trial strategy.

Moreover, the allegedly deficient performance did not prejudice Petitioner because he handled the issue adeptly. He explained that he had been driving his girlfriend's car and that the masks were hers. He claimed that his girlfriend owned a motorcycle, and he implied that she bought the masks because she was getting ready to go to Florida on her motorcycle and needed

22

the masks for her trip.   Petitioner explained that he had asked his girlfriend to say the masks were hers because they were her masks, but she was afraid and did not want to become involved in his case.  Id. at 49-51, 110.

Petitioner has failed to show that his attorney performed deficiently and that his allegedly deficient performance prejudiced him.  Therefore, the Court finds that Petitioner is not entitled to habeas relief on his third claim.

### 3.   Claims Five, Six, and Seven: The Prosecutor and Trial Counsel

The fifth habeas claim alleges that Petitioner's trial counsel failed to investigate and present evidence regarding Petitioner's and Mr. Simmons's cell phones.  Petitioner contends that defense counsel should have:  (i) investigated the disappearance of Petitioner's cell phone, which was seized from him in the hospital, and subpoenaed his cell phone records; and (ii) subpoenaed Simmons's cell phone records or requested a continuance to get the cell phone recharged so that it could be examined.  Petitioner claims that the cell phones and the cell phone records would have supported his defense that he and Simmons had agreed by phone to meet and discuss the money that Petitioner owed Simmons.  Pet. at 13.

In his seventh claim, Petitioner alleges that the prosecutor withheld evidence of the phones and deprived him of his right to present a defense.  Petitioner points out that, although the prosecutor made Simmons's cell phone available at trial, the phone was inoperable, apparently because of a dead battery.  As for Petitioner's cell phone, he says that the police confiscated it from him in the hospital after the shooting incident, and it was never produced at trial.  Id. at 14-15.

Finally, in his sixth claim, Petitioner alleges that his trial attorney should have objected, sought a continuance, or filed a motion for mistrial when the prosecution failed to produce the

23

cell phones and cell phone records.  Id. at 14.

### i. Procedural Default

Respondent contends that Petitioner procedurally defaulted habeas claims five, six, and seven by not raising them on direct appeal.  The Supreme Court has made it clear that a procedural default is "a critical failure to comply with state procedural law."  Trest v. Cain, 522 U.S. 87, 89 (1997).  The doctrine of procedural default prohibits a federal court from reviewing the merits of a habeas petitioner's claims, including constitutional claims, if a state court declined to hear the claims because the prisoner failed to abide by a state procedural rule. Martinez v. Ryan, 132 S. Ct. 1309, 1316 (2012).   In the Sixth Circuit,

> a habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met: (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look to the last reasoned state court decision disposing of the claim.

Henderson v. Palmer, 730 F.3d 554, 560 (6th Cir. 2013) (brackets, quotation marks, and citations omitted).

The state procedural rule in question here is Michigan Court Rule 6.508(D)(3), which prohibits state courts from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence.  An exception exists if the defendant shows "good cause" for his or her failure to raise the claims on appeal and "actual prejudice from the alleged irregularities that support the claim for relief."  Mich. Ct. R. 6.508(D)(3)(a)-(b).

Petitioner did not comply with this rule by raising his fifth, sixth, and seventh claims on direct appeal from his convictions.  Thus, the first procedural-default factor is met.

24

The second factor is satisfied because the last state court to review Petitioner's claim in a reasoned opinion was the trial court, which enforced Rule 6.508(D)(3). The trial court cited the rule and stated that Petitioner had failed to show "good cause" for not raising his claims on appeal and resulting prejudice. The third procedural-default factor also is satisfied, because Rule 6.508(D) is an adequate and independent state ground on which Michigan courts may rely to foreclose review of federal claims. Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005).

### ii. "Cause" for the Procedural Default

The remaining issue is whether Petitioner has shown cause for his procedural default of failing to raise all his claims on direct appeal and prejudice from the alleged unconstitutional irregularities. Petitioner alleges in his ninth claim that his appellate attorney was ineffective for not raising all his claims on direct appeal.

"Ineffective assistance of counsel can constitute cause for a procedural default," Hodges v. Colson, 727 F.3d 517, 530 (6th Cir. 2013), petition for cert. filed, Nos. 13A1070, 14-5246 (U.S. July 14, 2014), but "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default." Murray v. Carrier, 477 U.S. 478, 492 (1986). An attorney is constitutionally ineffective only when the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "[T]o assess the claim of ineffective assistance of appellate counsel as an excuse for defaulting the underlying claim[s], [courts] may look to the strength of the underlying claim[s]." Moore v. Mitchell, 708 F.3d 760, 778 (6th Cir.), cert. denied, 134 S. Ct. 693 (2013).

### 1. The Claim About the Prosecutor

Petitioner alleges that the prosecutor withheld evidence of Petitioner's cell phone and presented only Simmons's inoperable phone at trial. Under Brady v. Maryland, 373 U.S. 83

25

(1963), "a defendant's rights under the Due Process Clause are violated when a state suppresses material exculpatory information."  Cauthern v. Colson, 736 F.3d 465, 481 (6th Cir. 2013).  The elements of a Brady claim are as follows:  (i) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;" (ii) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and, (iii) "prejudice must have ensued."  Id. (quotation marks omitted).  Nevertheless, "if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source," there is no Brady violation. Carter v. Bell, 218 F.3d 581, 601 (6th Cir. 2000); see also Doan v. Carter, 548 F.3d 449, 460 (6th Cir. 2008) (holding that, where defense counsel knew of the withheld evidence, the prosecutor's failure to disclose the evidence could not form the basis for a Brady violation).

Simmons's phone was produced at trial.  See 4/24/08 Trial Tr. at 29.  Although the phone battery was dead, the prosecutor pointed out that the phone had "been in evidence since day one" and that, "[i]f somebody asked to look at it[,] they could have."  Id. at 31-32.  Defense counsel also knew about Petitioner's cell phone and did not ask for the phone until the second day of trial.  4/22/08 Trial Tr. at 153-56, 165.

Petitioner's Brady claim fails because the prosecution did not suppress evidence of Simmons's or Petitioner's cell phone and because defense counsel knew or should have known the essential facts permitting him to take advantage of information in the cell phones.  Appellate counsel, therefore, was not ineffective for failing to raise Petitioner's Brady claim on appeal.

### 2.  The Claims About Trial Counsel

The more difficult question is whether Petitioner's trial attorney was ineffective for failing to investigate Petitioner's and Simmons's cell phones and their cell phone records.

26

### a.   Simmons's Phone and Phone Records

Simmons's phone was produced at trial at defense counsel's request, but the phone was "dead," and defense counsel did not seek a continuance to re-charge the phone.  Mr. Simmons, however, testified that he neither called Petitioner on the night in question, nor arranged to meet Petitioner that night, and Mrs. Simmons corroborated Mr. Simmons's testimony by stating that her husband was not using a phone.  Both Mr. and Mrs. Simmons testified that they happened to be at the intersection where the shooting occurred because they made a wrong turn while on their way to meet friends at a bar.  And, according to the state troopers, Simmons was stopped at a traffic light when the shooting occurred, not at the gas station where Petitioner claimed that Simmons agreed to meet him.  There was additional evidence that Crouthers approached Simmons, repeatedly fired his gun at Simmons, who was unarmed, and then exchanged gunfire with the state troopers.

Given the strength of the evidence against Petitioner, his contention that Simmons's cell phone would show he had arranged to meet Simmons at the time and location in question was not plausible.  Therefore, the Court finds that defense counsel was not ineffective for failing to seek a continuance to re-charge Simmons's phone or to obtain Simmons's phone records.  The Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success."  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).

Furthermore, Petitioner did not present the state court with any evidence during post-conviction proceedings to show that Simmons actually called him or received a call from him that day.  Thus, the Court finds that defense counsel's allegedly deficient performance did not prejudice Petitioner.

27

### b.  Petitioner's Phone and Phone Records

Defense counsel requested Petitioner's phone, but apparently not the phone call records, and he did not request Petitioner's phone until the second day of trial.  The phone was not produced. Nevertheless, as Respondent points out, even if the phone and phone records could have been used to impeach Simmons's testimony that he did not call Petitioner on the night of the shooting, this would not have explained why Petitioner and Crouthers appeared to have followed Mr. and Mrs. Simmons from the Fox Theater, why they were armed, why Crouthers repeatedly fired his gun at Mr. Simmons without any provocation except possibly an argument, or why Petitioner and/or Crouthers engaged in a gun fight with the state troopers.  Therefore, the Court finds that defense counsel's allegedly deficient performance did not prejudice Petitioner.

To conclude, trial counsel's alleged negligence in failing to acquire cell phones and cell phone records did not rise to the level of constitutionally ineffective assistance.  And there is not a substantial probability that the result of the trial would have been different had defense counsel obtained Petitioner's or Simmons's cell phones and cell phone records.   Appellate counsel, therefore, was not ineffective for failing to raise Petitioner's claims about trial counsel on direct appeal because "[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial."  Coley v. Bagley, 706 F.3d 741, 752 (6th Cir.), cert denied, 134 S. Ct. 513 (2013).

### iii.  Prejudice; Miscarriage of Justice

Petitioner's fifth, sixth, and seventh claims lack merit.  Consequently, appellate counsel was not ineffective for raising the claims on direct appeal, and ineffective assistance of appellate counsel cannot excuse or constitute "cause" for Petitioner's procedural default.  The Court need not consider whether Petitioner has established prejudice from the alleged violation of

constitutional rights, because he has not shown "cause." Tolliver v. Sheets, 594 F.3d 900, 930 n.13 (6th Cir. 2010).

In the absence of "cause and prejudice," Petitioner can prevail on his procedurally defaulted claims only if he "demonstrate[s] that the failure to consider [his] claims will result in a fundamental miscarriage of justice.  A fundamental miscarriage of justice results from the conviction of one who is actually innocent." Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) (quotation marks omitted).  To be credible, however, "such a claim requires [the] petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995).  "A petitioner's burden at th[is] gateway stage is to demonstrate that more likely than not, in light of the new evidence, . . . any reasonable juror would have reasonable doubt." House v. Bell, 547 U.S. 518, 538 (2006).

Petitioner has not produced any new evidence of actual innocence, and the evidence against him at trial was substantial.  Therefore, a miscarriage of justice will not occur as a result of the Court's failure to address the substantive merits of Petitioner's fifth, sixth, and seventh habeas claims.  Those claims are procedurally defaulted and do not require a full-blown adjudication on the merits.

### 4.  Claim Nine: Appellate Counsel

As noted above, Petitioner's ninth and final claim alleges that appellate counsel was ineffective for failing to raise all his issues on direct appeal.  To the extent Petitioner is raising an independent claim about appellate counsel and is not merely asserting "cause" for his procedural default, the Court will address the claim.  The state trial court adjudicated the claim on post-

conviction review and determined that appellate counsel was not ineffective for failing to raise all of Petitioner's claims on direct appeal.  This Court agrees.

Under federal law, an appellate attorney's failure "to raise an issue on appeal can amount to constitutionally ineffective assistance."  Jalowiec v. Bradshaw, 657 F.3d 293, 321 (6th Cir. 2011).  But an appellate attorney is not required to raise every non-frivolous claim requested by his or her client if counsel decides not to raise the claim as a matter of professional judgment. Jones v. Barnes, 463 U.S. 745, 751 (1983).  "In fact, the process of winnowing out weaker arguments on appeal is the hallmark of effective appellate advocacy.  Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."  Monzo v. Edwards, 281 F.3d 568, 579 (6th Cir. 2002) (quotation marks and citations omitted).  To demonstrate that appellate counsel was ineffective, a habeas petitioner must show (i) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal, and (ii) there is a reasonable probability that he would have prevailed on appeal were it not for his appellate attorney's failure to raise the issues.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687-691, 694).

For the reasons given above in the discussion on "cause" for Petitioner's procedural default, appellate counsel's failure to raise all of Petitioner's claims on appeal was not unreasonable, and there is not a reasonable probability that Petitioner would have prevailed on appeal if his attorney had raised all his claims on appeal.  As the Sixth Circuit has repeatedly found, "[a]ppellate counsel cannot be found to be ineffective for failure to raise an issue that lacks merit."  Shaneburger v. Jones, 615 F.3d 448, 452 (6th Cir. 2010) (quotation marks omitted).  The Court's inquiry, therefore, is at an end.  Petitioner has no right to habeas relief on the basis of his independent claim concerning appellate counsel.

30

## B. Motion for Reconsideration

After Respondent filed a response to the habeas petition (Dkt. 8), Petitioner moved for an evidentiary hearing (Dkt. 10). He claimed that an evidentiary hearing was necessary because the record was silent on appellate counsel's strategy and because there were unresolved questions of fact regarding certain cell phone conversations he had with the victim. According to Petitioner, the phone calls demonstrate that he had no reason to participate in an attempt on the victim's life. See Pet'r Mot. at 1-2.

On June 11, 2014, the Court denied Petitioner's motion for an evidentiary hearing on the basis that the Court was limited to the record that was before the state court, because the state court decided Petitioner's claim about appellate counsel on the merits. See 6/11/14 Op. & Order at 4-5 (Dkt. 13). Petitioner has filed a motion for reconsideration of that order (Dkt. 14).

> Under the Local Rules of this District, the Court generally
>
> will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the Court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the Court and the parties and other persons entitled to be heard on the motion have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. LR 7.1(h)(3). "A 'palpable defect' is a defect which is obvious, clear, unmistakable, manifest, or plain." Hawkins v. Genesys Health Sys., 704 F. Supp.2d 688, 709 (E.D. Mich. 2010) (quoting Ososki v. St. Paul Surplus Lines Ins. Co., 162 F. Supp. 2d 714, 718 (E.D. Mich. 2001)).

Petitioner seeks reconsideration of the order denying him an evidentiary hearing. Although the Court determined in its previous order that it was precluded from holding an evidentiary hearing because the state court adjudicated Petitioner's claims on the merits,

31

Petitioner claims that the state trial court did not have an adequate record before it when it adjudicated his claims.  Petitioner also claims that the state court failed to consider <u>Mapes v. Coyle</u>, 171 F.3d 408, 427-428 (6th Cir. 1999), which lists eleven factors that courts should consider when determining whether an appellate attorney performed reasonably competently.

The issue of appellate counsel's representation arose on state collateral review when Petitioner moved for relief from judgment, requesting an evidentiary hearing and a new trial.  In an order addressing Petitioner's motion, the state trial court determined that Petitioner was not entitled to relief on his claims about trial counsel and the prosecutor unless he established "good cause" for his failure to raise his claims on appeal and "actual prejudice from the alleged irregularities."  <u>See</u> 12/30/11 Op., No. 07-024705-01, at *2 (Wayne Cnty. 3d Cir. Ct. Dec. 30, 2011) (Dkt. 9-13) (quoting Mich. Ct. R. 6.508(D)(3)).  Because Petitioner maintained that appellate counsel's performance was "cause" for his failure to raise his claims on direct appeal, the trial court considered whether appellate counsel was ineffective.  The trial court stated that, under the two-part test developed in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), Petitioner had to prove "that counsel's performance fell below objective standards of reasonableness, and that it is reasonably probable that the results of the proceeding would have been different had it not been for counsel's error."  12/30/11 Op., at *2-3 (quoting <u>People v. Frazier</u>, 733 N.W.2d 713, 720 (Mich. 2007)).

The trial court went on to say that Petitioner had failed to overcome the presumption that appellate counsel's decisions constituted sound strategy.  The court also stated that Petitioner had failed to show that counsel's performance fell below objective standards of reasonableness and that the results of the proceeding would have been different if appellate counsel had raised the issue of trial counsel's alleged ineffective assistance. The trial court concluded that Petitioner

had not established "good cause" or "actual prejudice" under Rule 6.508(D)(3) and, therefore, Petitioner was not entitled to relief from judgment.  See 12/30/11 Op., at *5.

It is clear from the trial court's analysis that the court addressed both prongs of the Strickland test when ruling on Petitioner's motion for relief from judgment.  Thus, the trial court adjudicated the merits of Petitioner's claim about appellate counsel, and this Court is limited to the record that was before the state court.  Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (holding "that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"); Keeling v. Warden, Lebanon Corr. Inst., 673 F.3d 452, 464 (6th Cir. 2012) (noting that, in light of Cullen, the Sixth Circuit is "limited to the state court record").  The fact that the trial court failed to cite Mapes, and may have based its decision on an inadequate record, does not change the fact that the court adjudicated the merits of Petitioner's claim.  Therefore, Petitioner is not entitled to an evidentiary hearing to develop the facts regarding his appellate counsel's strategy.

As for Petitioner's claims about trial counsel's failure to investigate and present evidence of Petitioner's cell phone records, and the prosecutor's alleged suppression of the records, the Court has already found these claims to be procedurally defaulted.  Under Michigan Court Rule 6.508(D)(3), state courts are prohibited from granting relief from judgment if a defendant could have raised his claims on appeal from his judgment or sentence unless the defendant shows "good cause" for his or her omissions and "actual prejudice from the alleged irregularities."  The state trial court ruled that Petitioner could have raised his claims about trial counsel and the prosecutor on direct appeal, and that Petitioner failed to establish "good cause" for not raising the claims on appeal and "actual prejudice."  The state court's reliance on the procedural bar set forth in Rule 6.508(D)(3) was an adequate and independent state ground on which the state court

could rely to foreclose review of Petitioner's federal claims. Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005). Consequently, Petitioner's claims about the cell phone records were procedurally defaulted, as noted above, and Petitioner is not entitled to an evidentiary hearing on the allegedly unresolved questions of fact regarding his cell phone conversations with the victim.

Accordingly, the Court finds that Petitioner has not shown that the Court made a palpable defect when it denied his motion for an evidentiary hearing. Petitioner is not entitled to an evidentiary hearing on the allegedly unresolved questions of fact regarding his cell phone conversations with the victim. Therefore, the Court denies Petitioner's motion for reconsideration of the order declining to grant an evidentiary hearing.

### C.  Certificate of Appealability

Before Petitioner may appeal this Court's dispositive decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court rejects a habeas claim on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong. See Slack v. McDaniel, 529 U.S. 473, 484 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327. In applying that standard, a district court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of the petitioner's claims. Id. at 336-337. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the

applicant."  Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254; Castro v. United States, 310 F.3d 900, 901 (6th Cir. 2002).

Having considered the matter, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his claims; reasonable jurists would not conclude that Petitioner's claims deserve encouragement to proceed further. Accordingly, a certificate of appealability is not warranted in this case.

### D.  Leave to Proceed In Forma Pauperis

Although the Court denies a certificate of appealability to Petitioner, the standard for granting an application for leave to proceed in forma pauperis (IFP) is a lower standard than the standard for certificates of appealability.  Foster v. Ludwick, 208 F. Supp. 2d 750, 764 (E.D. Mich. 2002) (citing United States v. Youngblood, 116 F.3d 1113, 1115 (5th Cir. 1997)). Whereas a certificate of appealability may only be granted if a petitioner makes a substantial showing of the denial of a constitutional right, a court may grant IFP status if it finds that an appeal is being taken in good faith.  Id. at 764-765; 28 U.S.C. § 1915(a)(3); Fed. R. App. 24(a). "Good faith" requires a showing that the issues raised are not frivolous; it does not require a showing of probable success on the merits.  Foster, 208 F. Supp. 2d at 765.  Although jurists of reason would not debate the Court's resolution of Petitioner's claims, the issues are not frivolous; therefore, an appeal could be taken in good faith and Petitioner may proceed in forma pauperis on appeal.  Id.

### V.  CONCLUSION

For the reasons set forth above, the Court denies the petition for writ of habeas corpus (Dkt. 1), declines to issue a certificate of appealability, and grants leave to appeal in forma pauperis.  The Court further denies Petitioner's motion for reconsideration (Dkt. 14).

SO ORDERED.


Dated:  March 17, 2015                    s/Mark A. Goldsmith
         Detroit, Michigan              MARK A. GOLDSMITH
                                         United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 17, 2015.

                                         s/Johnetta M. Curry-Williams
                                         Case Manager

36